UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PATRICIA DILLON, M.D., M.P.H.,

                Plaintiff,

       -against-

SUFFOLK COUNTY DEPARTMENT OF
HEALTH SERVICES, HUMAYUN
CHAUDHRY, individually and as
Commissioner of the Suffolk County
Department of Health Services, and
VINCENT GERACI, individually and as
Medical Program Administrator of the Jail
Medical Unit of the Suffolk County
Department of Health Services,

               Defendants.

-------------------------------------------------------------x

07-CV-4722
(ADS)(WDW)


AMENDED VERIFIED
COMPLAINT

      Plaintiff Patricia Dillon, by her attorneys The Law Offices of David S. Feather,

complains against the defendants as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Dr. Patricia Dillon seeks compensatory damages, punitive damages,

equitable relief and attorneys' fees against the above-named defendants based on the

defendants having: (1) taking adverse employment actions against Dr. Dillon, including

but not limited to suspending her from employment without pay, bringing charges against

her pursuant to New York State Civil Service Section 75, and amending those charges,

all in retaliation for her exercise of free speech, speaking as a citizen regarding a matter

of public concern in complaining of consciously indifferent medical treatment of

prisoners and possible prisoner abuse in the Riverhead Correctional Facility in Suffolk

County, New York; and (2) taking adverse employment actions against Dr. Dillon in

violation of New York Civil Service Law § 75-B by retaliating against her for reporting

illegal conduct and/or conduct that she reasonably believed constituted improper

government action.

## JURISDICTION AND VENUE

2.      The United States District Court for the Eastern District of New York has

jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and

1367.  All causes of action herein arise under the Constitution or laws of the United

States, or derive from the same nucleus of operative facts as a cause of action arising

under the Constitution or laws of the United States.

3.      Venue is proper in the United States District Court for the Eastern District of New

York pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions

giving rise to the claims alleged herein occurred within the judicial district and at least

one defendant resides within that judicial district.

## PARTIES

4.      Plaintiff Patricia Dillon, M.D., is and was at all times relevant hereto a resident of

the County of Suffolk, State of New York.

5.      Defendant Suffolk County Department of Health Services is a department of

Suffolk County, a County within the State of New York.

6.      At all relevant times set forth herein, Defendant Humayun Chaudhry was the

Commissioner of the Suffolk County Department of Health Services, and is a resident of

the County of Suffolk, State of New York.

7.      Upon information and belief, defendant Vincent Geraci, Medical Program

Administrator of the Jail Medical Unit for the Suffolk County Department of Health

Services, which is located within the Suffolk County Correctional Facility in Riverhead, New York, is and was at all times relevant hereto a resident of the County of Suffolk, State of New York.

8.     At all relevant times set forth herein, Defendants Dr. Chaudry and Dr. Geraci were acting under color of state law, statute, ordinance, regulation, custom and/or usage.

## FACTS

9.     Dr. Patricia Dillon earned her medical degree from Dartmouth Medical School in 1986. She thereafter attended two years of General Surgical Residency training and completed a residency in General Preventive Medicine and Public Health. Dr. Dillon earned a Masters of Public Health degree from Columbia University in 1994, and became Board Certified in Public Health and Preventive Medicine in 1996.

10.     From 1998 to 2001, when she began working for the Suffolk County Department of Health Services, Dr. Dillon was employed by the Brookhaven National Laboratory, specializing in chemical, radiation and biological contamination. Prior to that, Dr. Dillon spent fifteen years working with the U.S. Department of Health and Human Services developing and implementing various public health programs for the Navajo tribal reservation in the Southwestern United States. Dr. Dillon also worked for Blue Cross/Blue Shield of Iowa and New York State IPRO, conducting research and data analysis related to preventive medicine, and from 1994 to the present, Dr. Dillon has worked part-time in the Psychiatry Department at the Veteran's Administration hospital in Northport, New York. Early in her career, from 1988 to 1994, Dr. Dillon spent six years working as a house physician at Mercy Hospital in Rockville Centre, New York.

11.     From December, 2001 to August 22, 2007, Dr. Dillon served as the Director of
Communicable Disease and Epidemiology Division of the Suffolk County Department of
Public Health, a division within the Suffolk County Department of Health Services.  She
also served as the Acting Director of the Suffolk County Department of Public Health
from Spring, 2005 to August 22, 2007.  In this capacity, Dr. Dillon was responsible for
all public health issues and bio-emergency preparedness for a population of over one and
a half million people, overseeing a department of 200 employees and managing a budget
of over twenty-four million dollars.

12.     During her entire employment with the Suffolk County Department of Public
Health, Dr. Dillon performed no clinical work.  Prior to August 22, 2007, Dr. Dillon has
never received negative feedback from her supervisors related to her job performance at
the Suffolk County Department of Public Health, and had received the highest available
scores on all of her employee evaluations.

13.     On or about April 19, 2007,  Suffolk County Executive Steven Levy nominated
Humayun J. Chaudhry, D.O., as the County's new Commissioner of Health Services, and
Dr. Chaudhry was sworn in on or about May 2, 2007.

14.     On August 22, 2007, Dr. Chaudhry, citing "operational needs," reassigned Dr.
Dillon to the Riverhead Correctional Facility, Jail Medical Unit, under the supervision of
Dr. Vincent Geraci.

15.     At no prior time had Dr. Chaudry criticized Dr. Dillon's work performance to her,
either formally or informally.

16.     Upon information and belief, at the time of her transfer to the Riverhead Correctional Facility, Jail Medical Unit, there was no budgeted position in that facility for another physician.

17.     On September 4, 2007, Dr. Dillon met with Dr. Geraci to discuss her new assignment.  Dr. Dillon was part of Dr. Geraci's medical staff, and served in a subordinate role that did not include managerial functions, policy making, or formal policy recommendations.

18.     Dr. Dillon's specific job responsibilities were never elucidated to her, and at no time during her tenure at the Jail Medical Unit was Dr. Dillon ever given a verbal or written job description regarding her duties at that facility.

19.     Indeed, from September 4 through September 7, 2007, Dr. Geraci repeatedly told Dr. Dillon that he had no work assignment for her, and did not know what to do with her.

20.     During this initial discussion, Dr. Geraci explained the nature and procedures of the JMU to Dr. Dillon, and in the course of that conversation told Dr. Dillon that:

    a.     The JMU routinely denies methadone to patients in methadone maintenance programs.  When they do allow patients to take methadone, they give it only to Suffolk and Nassau County residents, not New York City residents.

    b.     As a cost-saving measure, the JMU does not provide asthma inhalers to patients.

    c.     As a cost-saving measure, the JMU delays starting patients on medication for several days after they arrive.

    d.     The nurses at the JMU make a note in each patient's chart whenever they give that patient medication, identifying themselves through a designated number or letter.  When patients are not given medication for whatever reason, the staff is instructed to write a "3" on the patient's chart, as if the medication had been administered by a fictitious nurse designated nurse number three.

e.  One of the jail physicians gives the inmates Vicodin "like candy" and one of the patients, named XC,[1] recently overdosed after being released from the jail with either a blank prescription page or a prescription made out for 100 Vicodin.

f.  It had recently been discovered that the JMU nurses were failing to conduct PPD Tuberculosis testing on incoming inmates upon their arrival at the jail, and when the PPD tests were performed, the nurses did not interpret the results within 48 hours as required; the delayed testing and delayed diagnosis resulted in the general inmate population being exposed to Tuberculosis..

g.  The JMU staff consider themselves "guests" of the Sheriff and correctional officers, and should always attempt to please the Sheriff and correctional officers.

21.   During this conversation, in response to the matters discussed by Dr. Geraci, Dr. Dillon expressed concern that the patients in the Riverhead Correctional Facility's Jail Medical Unit were receiving sub-standard care.  Dr. Geraci responded to Dr. Dillon by stating that inmates are entitled to a lesser standard of care than the general population.

22.   The next day, Wednesday, September 5, 2007, while waiting to be told of her specific duties at the jail, Dr. Geraci asked Dr. Dillon to assist him with chart reviews.

23.   Upon information and belief, these chart reviews are supposed to be conducted by an auditor from the Suffolk County Department of Health Services who is not directly involved in the treatment and care of the patients whose charts are being reviewed.  Dr. Geraci, however, would complete the reviews himself and then submit the completed reviews to the appropriate officials.

24.   While reviewing these charts, Dr. Dillon noted that the patients were receiving inadequate treatment.  One patient's chart that Dr. Dillon reviewed with Dr. Geraci showed that the patient presented with elevated calcium levels and had been designated with sarcoidosis, an autoimmune disorder with a characteristic symptom of nodules

---

[1]  Patients are identified only by their initials so as to protect their confidentiality.

6

developing on the patient's lungs, without reference to any radiology reports that should be standard practice in reaching such a diagnosis. Another chart showed that a patient had received no treatment for broken ribs, not even pain medication.

25.     When Dr. Dillon reported her concerns to Dr. Geraci, he informed her that he only puts positive comments in the chart reviews. For one of the charts about which Dr. Dillon had expressed concern, Dr. Geraci pointed out that the nurse notes stated that the nurse had inquired as to whether the patient regularly wore a condom while having sex, and offered this as an example of something positive that can be mentioned in the chart review.

26.     During this conversation, Dr. Geraci reviewed a letter from an attorney representing a prisoner, C.M. The letter was addressed to the Sheriff, was hand delivered by Dr. Geraci by a deputy, and claimed that C.M. was not receiving necessary medication. Dr. Dillon examined C.M.'s chart and saw that C.M. had been diagnosed with a tumor behind his left eye, but was not receiving pain medication. Dr. Dillon further noted that a recommended biopsy on the tumor had been delayed for at least a month.

27.     Dr. Dillon heard Dr. Geraci tell the Sheriff's deputy that he would call the attorney and handle the situation, and then Dr. Geraci told Dr. Dillon that such situations can usually be resolved by a phone call. Dr. Geraci then phoned the jail pharmacist, Ralph Trentadue, and ordered that a prescription for Vicodin be issued to C.M.

28.     Later that day, Dr. Dillon expressed concern to Rick Kaufman, a social worker in the JMU who serves as Dr. Geraci's second-in-command, that the patients at the Riverhead Correctional Facility were receiving substandard medical care.

29.     Mr. Kaufman directed Dr. Dillon's attention to the chart of inmate S.E., which contained blank spaces and undated notes, and informed Dr. Dillon that the JMU frequently refrains from dating psychological progress notes and leaves blank spaces in the progress notes section of the charts for mentally ill patients so as to make it easier to alter the records at a later date.

30.     Mr. Kaufman warned Dr. Dillon to remember that the JMU staff were "guests of the Sheriff", and should avoid upsetting him.  Mr. Kaufman then stated that the corrections officers often beat the inmates, and had killed one inmate several years earlier by throwing him down an elevator shaft.

31.     During this same conversation, Mr. Kaufman also mentioned that the mentally ill patients are frequently assaulted by other inmates.

32.     Also on Wednesday, September 5, 2007, Dr. Dillon, while sitting in Dr. Geraci's office, overheard a phone conversation between Dr. Geraci and inmate C.M.'s attorney.  Dr. Dillon heard Dr. Geraci misleadingly assure the attorney that the patient had, in fact, been receiving his medication all along.

33.     Later that day, and continuing through Thursday, September 6, 2007, Dr. Dillon was assigned to a secretary's desk in the file room and told to help file charts and conduct chart reviews.  While filing these charts, Dr. Dillon observed further evidence of inadequate medical treatment and prisoner abuse, and made photocopies of the relevant portions of these charts.

34.     Among the patients whose charts showed evidence of inadequate treatment and abuse were the following:

Prisoner Abuse:

A.   T.C. presented to the medical clinic with an injury to right eyebrow area. T.C.'s chart contains a crossed-out but still legible notation that he was injured in an "altercation," and this notation has been replaced by the statement that T.C. fell in the shower.

B.   R.L. sustained a skull fracture on August 15, 2007. Neurological surgery consultation was not approved by Dr. Geraci until two weeks after the injury, August 29, 2007, and surgery to repair the skull fracture was not scheduled until September 13, 2007, nearly a month after the injury.

C.   E.P. was hospitalized multiple times for facial bruising and lacerations, a broken tooth and vomiting blood, despite being in solitary confinement, and complained to emergency room physician that he had been attacked by the police. His chart notes an abnormal EKG, but did not contain EKG results; the chart notes elevated cardiac CK, indicating heart damage, but this was not followed up on; and the chart notes signs and symptoms of pancreatitis, but it appears no further diagnostic tests were performed.

D.   R.C. was assaulted three times between July 6, 2007 and August 20, 2007.

Negligent Treatment:

E.   M.D. had three episodes of cardiac dysrhythmia, two of which were life threatening, due to erratic administration of heart medication.

F.   T.W., an insulin dependent diabetic, repeatedly presented to clinic with high glucose levels and was once hospitalized for life threatening high glucose level due to a failure to administer insulin.

G.   R.H. was prescribed anti-hypertensive medication but the medication was never administered.

H.   J.P. a patient with a past history of cardiac illness, had abnormal EKG results that were not followed up on and was denied emergency treatment for cardiac ischemia and possible myocardial infarction, which may have caused him to suffer permanent cardiac injury.

I.   J.P. a patient with a history of cardiomyopathy, was not given his medications, resulting in cardiac dysrhythmia, chest pain and the need for hospital admission.

J.   J.S. was denied medication for hypertension, despite the fact that he had been prescribed medication at a previous correctional facility.

K.      <u>G.R.</u> was transferred to Riverhead Correctional Facility approximately one month after being hospitalized for renal failure, and he was re-hospitalized after the ace inhibitor and other medications that had been prescribed at his prior facility were not administered at the Riverhead facility.

35.     Dr. Dillon reported these concerns to Dr. Geraci, but her concerns were dismissed.  Dr. Dillon further recommended that federal and/or state authorities be contacted to perform an outside audit of the Jail Medical Unit.  Dr. Geraci also dismissed this recommendation.

36.     On Thursday, September 6, 2007, Dr. Dillon called Paul Sabatino, the Chief Deputy County Executive, and discussed some of her concerns with him regarding the ordering and dispensation of pharmaceuticals at the JMU.

37.     Upon information and belief, shortly after this conversation, Mr. Sabatino discussed Dr. Dillon's concerns and suspicions with Mr. Fred Pollert, the Suffolk County Budget Director.

38.     On or about Friday, September 7, 2007, Dr. Geraci told Dr. Dillon that because she was a woman, she would need to start seeing OB/GYN patients.  Dr. Dillon explained that she had no experience or training in gynecology and was not properly credentialed to treat patients in that area.  In response, Dr. Geraci told Dr. Dillon that he would have one of the nurse practitioners train Dr. Dillon in gynecology and would file the paperwork to have Dr. Dillon credentialed as a gynecologist.

39.     On either Friday, September 7, 2007, or Monday, September 10, 2007, Dr. Dillon saw John Heilbrunn, a contracts administrator with Suffolk County Health Services, and expressed her concerns to Mr. Heilbrunn, telling him that in the week she had been working at the correctional facility, she had learned that necessary medications were not being prescribed and even prescribed medications were not being administered to the

10

patients, that there was an unwritten policy requiring nurses to list unadministered medications as having been administered by a fictitious nurse number three, that abnormal test results were removed from charts, that injured and acutely ill patients were being neglected and left untreated, that required diagnostic tests were not being performed, and that the mistreatment of patients was being covered up.

40.     On Monday, September 10, 2007, Dr. Dillon contacted Dr. Chaudhry and informed him of two of her concerns:  first, that Dr. Geraci had instructed her that inmates are entitled to a lesser standard of medical care that the general population; and second, that when patients at the JMU were not administered medication, the staff was instructed to note that the medication had been administered by a fictitious nurse rather than clearly noting that medication had not been administered.

41.     On Monday, September 10, 2007, Dr. Geraci indicated to Dr. Dillon that although she was not a gynecologist, she had been sent to JMU to replace a female physician on their staff who had served as the JMU's gynecologist.

42.     That same day, September 10, 2007, Dr. Geraci received a questionnaire from the Suffolk County Director of Compliance, Linda Mermelstein, MD, MPH, listing various areas of competency required to be credentialed to practice gynecology.  Dr. Geraci instructed Dr. Dillon to sign the papers attesting that she was competent in all the various areas, and stated that he would approve the forms and submit the paperwork for her to be certified as a gynecologist.  Dr. Dillon refused, stating that she, in fact, did not know how to perform the listed procedures.

43.     In response, Dr. Geraci insisted that Dr. Dillon either agree to apply for gynecology privileges or submit a written refusal to see patients, and stated that, if Dr.

Dillon refused, he would ask the Department of Health Services to intervene. Dr. Dillon reiterated her concerns regarding substandard care of the patients at the Riverhead Correctional Facility's Jail Medical Unit, and informed Dr. Geraci that she had informed her union of the situation and they had advised her not to sign anything. Following this conversation, Dr. Geraci demanded that Dr. Dillon leave the JMU, even though she had not completed her full tour that day. He then escorted her to the ladies bathroom, and then off the premises.

44.    As a result, Dr. Dillon was later charged with having left early that day.

45.    From September 4 through September 11, 2007, Dr. Dillon continued to photocopy "problematic" charts and bring them to Dr. Geraci's attention.

46.    On Tuesday, September 11, 2007, Dr. Dillon reported to the file room as she had on previous days, but was told by a file clerk that she needed to speak with Dr. Geraci before filing any charts. Dr. Dillon waited to speak with Dr. Geraci and, while she was waiting, examined a chart on the table where she was sitting, and noticed that substantial portions of the chart were missing.

47.    Dr. Geraci called Dr. Dillon into his office, where Rick Kaufman was already waiting. Dr. Geraci told Dr. Dillon that her seat was being moved from the file room to exam room number three, and handed her a new protocol that forbade photocopying patient charts.

48.    From the time she received the new policy forbidding the photocopying of medical records, Dr. Dillon never photocopied a document.

49.    Dr. Dillon then showed Dr. Geraci the chart she had been examining, pointing out that it appeared that significant portions of the chart were missing. Dr. Geraci ripped a

portion of a page from the chart and, after initially crumpling it, handed it to Mr.

Kaufman, and told Mr. Kaufman to go re-file the page. Dr. Geraci then turned to Dr.

Dillon and said: "You can see here that charts get misfiled all the time. Some last names

are very common here."

50.     At around noon on September 11, 2007, in response to her earlier e-mail, Dr.

Chaudhry sent Dr. Dillon an e-mail stating that "as a reminder, Dr. Geraci is your

immediate and direct supervisor and it is correct to work with him in the chain of

command to clarify any questions or confusion you may have about Jail Medical Unit

(JMU) operations or your role in them."

51.     On or about September 10, 2007, the Jail Medical Unit's Pharmacist, Ralph

Trentadue, cautioned Dr. Dillon that she was angering the Corrections Officers, and that

one of them "would just as soon rip your head off as look at you".

52.     On or about September 11 and 12, 2007, Nurse Practitioners Amy Malave and

Alice Butkos cautioned Dr. Dillon that previous Jail Medical Unit employees who

angered the Sheriff or Corrections staff suffered retaliation, including false arrest and

public humiliation.

53.     On Tuesday, September 11, 2007, or on Wednesday, September 12, 2007, Dr.

Dillon spoke with Dr. Roginsky, one of the Peconic Bay Medical Center physicians who

treats patients from the Riverhead Correctional Facility, and discussed her concerns

regarding the substandard level of care given to patients from the Riverhead Correctional

Facility's Jail Medical Unit. Specifically, Dr. Dillon informed Dr. Roginsky that she had

observed medications not being administered as prescribed, and sometimes not being

prescribed at all, and necessary diagnostic tests not being ordered, and not being performed when ordered.

54.     Dr. Roginsky informed Dr. Dillon that he was aware that the pharmacist, Ralph Trentadue, often refused to fill prescriptions that he, Dr. Roginsky, had written, particularly prescriptions for pain medication, and told Dr. Dillon that the pharmacist had once refused to fill an order for pain medication that Dr. Roginsky had prescribed for a patient who had undergone a total hip replacement.  Dr. Roginsky then warned Dr. Dillon to avoid making complaints that would make the Sheriff, the corrections officers or Dr. Geraci feel threatened, and advised Dr. Dillon of several former employees who had been retaliated against for complaining that the prisoners were being mistreated.

55.     On Wednesday, September 12, 2007, Dr. Geraci instructed Dr. Dillon to read a book entitled "A Guide to Physical Examination and History Taking" and spend the morning shadowing the nurse practitioners, Amy and Alice, as they performed exams.

56.     At or around 2:30 p.m. on September 12, 2007, Dr. Dillon met with Dr. Geraci, Rick Kaufman and John Helibrunn, and Dr. Geraci accused Dr. Dillon of the unauthorized photocopying of patient files.  Dr. Dillon stated that she would not answer any questions without her union representative present, and Mr. Kaufman stated that, since a union representative was not available and he would be out for the next two days, they would discuss the matter on Monday.

57.     On Thursday, September 13, 2007, shortly after Dr. Dillon arrived at work, Dr. Dillon overheard nurses complaining that Dr. Geraci had changed the policy of noting times where medication was not administered by noting on the chart that the medication was administered by fictitious nurse number three, and now the nurses were required to

sign their own names to the charts indicating that they had administered the medication, regardless of whether the medication was actually given.

58.     Shortly after overhearing this conversation, Dr. Dillon was called into Dr. Geraci's office, where John Heilbrunn and three men in plain clothes with handcuffs hanging from their belts were waiting.  Dr. Geraci demanded that Dr. Dillon produce any photocopies of patient charts that she had made, and when Dr. Dillon failed to comply, Dr. Geraci informed her that she was being suspended without pay for thirty (30) days and had the three men escort her off the premises, holding her wrists behind her back.

59.     On or about September 25, 2007, Dr. Dillon received charges preferred against her by the Defendant pursuant to New York State Civil Service Law §75.

60.     The Defendant directed Dr. Dillon to return to the Jail Medical Unit on October 17, 2007.  Dr. Dillon did not do so, and subsequently learned, upon information and belief, that the Defendant was planning on having her arrested if/when she arrived at work that day.

61.     On November 13, 2007, Dr. Dillon filed the instant lawsuit in the Eastern District of New York.

62.     On that same day, the Defendant, without notifying Dr. Dillon, removed her from payroll.  The Defendant did not reinstate the Plaintiff back on to payroll until January 28, 2008.

63.     On November 15, 2007, Dr. Dillon received a notice, informing her that the County was going to terminate her health insurance benefits effective November 18, 2007, unless she immediately paid the health insurance premiums.

64.     That same day, Dr. Dillon sent the Defendant her COBRA payment via certified mail, and confirmed that it was received prior to the November 18, 2007 deadline.

65.     On or about November 30, 2007, the Defendant, through its spokesperson, was quoted in Newsday as stating that Dr. Dillon was suspended for, inter alia, violating federal patient privacy laws.  This statement was false.

66.     On December 3, 2007, and despite Dr. Dillon having a return receipt indicating that her COBRA payment was received, the Defendant canceled Dr. Dillon's heath insurance retroactive to November 18, 2007.

67.     On December 3, 2007, the Defendant sent Dr. Dillon a certified notice of scheduled psychological examination.

68.     Dr. Dillon appeared for a psychological examination with the Defendant-appointed psychologist on December 14, 2007.  This evaluation was continued on December 21, 2007.

69.     On January 10, 12, 13 and 14, 2008, Dr. Dillon spoke to Mr. Chris McPartland, the Suffolk County District Attorney's Government Corruption Bureau Chief, regarding her concerns about the medical treatment of prisoners in the Riverhead Correctional Facility, as well as the forgery, destruction and adulteration of medical records.

70.     Upon information and belief, on or before January 16, 2008, Mr. McPartland spoke to a representative of the Suffolk County Attorneys' office regarding Dr. Dillon's concerns.

71.     On January 24, 2008, the Defendant notified Dr. Dillon that her health insurance was cancelled as of December 17, 2007.

72.     On or about January 28, 2007, the Defendant "found" Dr. Dillon's COBRA

check, and retroactively applied it to cover past-due premiums.  However, the Defendant

did not reinstate Dr. Dillon's health insurance coverage at that time.

73.     On January 28, 2008, the Defendant assigned Dr. Dillon to a new position in its

Southampton Clinic.

74.     When Dr. Dillon reported to work, she was informed that the Defendant expected

her to perform the duties of an ObGyn physician, and not the administrative duties for

which she was first hired in 2001, and which she had previously been performing.

75.     In fact, upon her arrival at the Southampton Clinic, Dr. Dillon discovered that the

Medical Director of the Clinic, Dr. Wickramaaratachi, was under the incorrect impression

that she is a Family Practitioner.

76.     When Dr. Dillon informed Dr. Wickramaaratachi that her background was in

General Surgery and not in Primary Care, he told her that he was not comfortable with

her seeing patients.

77.     However, after leaving the room and then returning, Dr. Wickramaaratchi

assigned Dr. Dillon to the ObGyn/Pap Smear Room, and told her that he expected her to

manage "Adult" patients.

78.     On January 28, 2008, Dr. Dillon was directed to bill Medicaid with a computer

that has been pre-programmed to falsely attest that she is board-certified in Family

Practice.

79.     On January 29, 2008, Defendant Chaudry directed Dr. Wickramaaratchi to give

him daily reports regarding Dr. Dillon.

80.     On January 30, 2008, Dr. Wickramaaratchi's supervisor, Dr. Shaheda Iftikhar, directed Dr. Wickramaaratchi to send her daily reports regarding Dr. Dillon.

81.     Upon information and belief, these daily reports were forwarded by the Defendant to the Suffolk County Attorneys' office.

82.     On February 11, 2008, the Defendant claimed they never received a health insurance form mailed by Dr. Dillon on December 26, 2007.  Dr. Dillon sent this form via certified mail, return receipt requested, and the return receipt indicated that it was received on December 27, 2007.

83.     On February 12, 2008, Dr. Dillon was reinstated to the Defendant's payroll.

84.     From her transfer to the Southampton Clinic until in or about May 14, 2008, Dr. Dillon repeatedly requested confirmation that she was covered by the County's medical malpractice insurance.  The Defendant failed and refused to respond to her inquiry(ies).

85.     Throughout this time period, Dr. Dillon repeatedly requested that she be provided medical textbooks to review, to begin preparing herself for her new job assignment in Primary Care medicine.  Despite her request(s), the Defendant failed and refused to provide her with same until February 20, 2008.

86.     From her initial assignment to the Primary Care Clinic on January 28, 2008 through May 14, 2008, Dr. Dillon repeatedly requested formal medical training in Primary Care medicine, the new field in which she was expected to perform.

87.     Despite her request(s), the Defendant failed and refused to provide her with said training.

88.     On April 21, 2008, Dr. Dillon filed an Article 78 proceeding against the County of Suffolk and her union.

18

89.     Upon information and belief, on or about April 30, 2008, Dr. Dillon's then-private legal counsel was advised by the County, in writing, that they were not allowed to attend her Civil Service §75 hearing.  This is contrary to New York State law.

90.     On May 2, 2008, Dr. Dillon asked her direct supervisor, Dr. Wickramaaratachi, for a job description and duties.  In response, Dr. Wickramaaratachi informed Dr. Dillon that he would provide her with same on Monday, May 5, 2008.  However, he never did so.

91.     On or about May 7, 2008, Dr. Dillon was once again informed that her health insurance form was still not received, despite the fact that she had mailed it in December, 2007 via certified mail.  As a result, Dr. Dillon and her family were still without health insurance.

92.     On or about May 14, 2008, the Defendant transferred Dr. Dillon to the Riverhead Clinic, where she was directed that she was not to go near patients or medical charts, and where she was assigned to a solitary room, which she was only allowed to exit for a lunch period and two fifteen (15) minute breaks.

93.     The Defendant further failed and refused to provide Dr. Dillon with a job description or list of duties, despite her repeated requests that she be provided same.

94.     Upon information and belief, employees in both the Defendant's Southampton Clinic and the Riverhead Clinic were instructed and threatened not to speak to Dr. Dillon.

95.     On May 17, 2008, the Defendant filed additional disciplinary charges against Dr. Dillon, pursuant to New York State Civil Service Law §75.

96.     On May 18, 2008, Dr. Dillon received her first ever negative job evaluation.

97.     On June 18, 2008, Dr. Wickramaaratachi entered Dr. Dillon's solitary room, and, using foul language toward her, raised his hand to her face.  Dr. Dillon immediately reported Dr. Wickramaaratchi's behavior to County officials.

98.     The next day, Dr. Dillon was informed by the Defendant that it "audited" her past time receipts and eliminated all but five hours of Dr. Dillon's accrued vacation.

99.     Prior to this, according to her time records, Dr. Dillon had over one month of accrued comp, personal and vacation time.

100.    Upon information and belief, sometime prior to January 13, 2009, the Defendant filed a complaint against Dr. Dillon with the New York State Office of Professional Misconduct, accusing her of medical, legal and/or ethical malfeasance.

101.    On January 13, 2009, Dr. Dillon was informed that an investigation had been commenced against her by the New York State Office of Professional Misconduct.

102.    Upon information and belief, this investigation was commenced as a result of the Defendants' filing of the aforesaid false complaint against Dr. Dillon.

103.    Despite this investigation, no charges have ever been brought against Dr. Dillon by the New York State Office of Professional Misconduct.

104.    Upon information and belief, this investigation has been closed.

105.    Despite having been placed back on the Defendant's payroll on January 28, 2008, Dr. Dillon's health insurance was only reinstated on January 15, 2009.

106.    A hearing pursuant to New York State Civil Service Law Section 75 was held over multiple dates from May 30, 3008 to October 16, 2008.

107.    By decision dated January 31, 2009, the Hearing Officer sustained some of the charges against Dr. Dillon, while dismissing others.

108.    Dr. Dillon was terminated effective February 10, 2009.  However, the Defendant

failed and refused to release the Hearing Officer's report to her until February 17, 2009.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### First Amendment Retaliation

109.    Plaintiff Patricia Dillon was, and at all times relevant hereto, a public employee of

the County of Suffolk, State of New York.

110.    On several occasions between September 4, 2007 and September 13, 2007, as

well as on January 10, 12, 13 and 14 2008, Dr. Dillon expressed concern over the

deliberately indifferent medical treatment and abuse of prisoners in the Riverhead

Correctional Facility, in Suffolk County, New York, as well as the forgery, alteration and

destruction of medical records, and the possible use/misuse of pharmaceuticals at that

institution.

111.    As a result of her concerns, Dr. Dillon suggested that proper federal and state

authorities be notified to conduct an investigation.

112.    These concerns were expressed to, among others, Dr. Humayun Chaudhry,

Commissioner of the Suffolk County Department of Health Services, Vincent Geraci,

Medical Program Administrator of the Suffolk County Jail Medical Unit, Rick Kaufman,

assistant administrator of the Suffolk County Jail Medical Unit, John Heilbrunn,

Contracts Administrator for the Suffolk County Department of Health Services, Paul

Sabatino, the Chief Deputy County Executive, Chris McPartland of the Suffolk County

District Attorneys' office, and others.

113.    The deliberately indifferent medical treatment of prisoners, and the possible abuse of prisoners, the forgery, destruction and alteration of medical records, and the misuse of pharmaceuticals are matters of public concern.

114.    Calling attention to deliberately indifferent medical treatment of prisoners, the possible abuse of prisoners, the forgery, destruction and alteration of medical records, and the potential misuse of pharmaceuticals was not part of Dr. Dillon's employment duties.

115.    In making the above-referenced statements, Dr. Dillon was acting in her capacity as a citizen of the United States of America.

116.    On or about September 13, 2007, Dr. Dillon was suspended without pay for thirty (30) days from her employment with Suffolk County Department of Health Services.

117.    The suspension of Dr. Dillon, without pay, as well as the bringing of charges against her pursuant to New York Civil Service Law §75, the amendment of those charges, and the other actions set forth herein, constitute adverse employment actions.

118.    The suspension of Dr. Dillon, without pay, as well as the other adverse employment actions taken against her as set forth herein, were substantially motivated by Dr. Dillon's expression of concern over deliberately indifferent medical treatment of prisoners, the possible abuse of prisoners, the forgery, destruction and alteration of medical records, and for bringing the instant lawsuit.

119.    By suspending Dr. Dillon without pay, and taking the other adverse employment actions against her as set forth herein, Dr. Dillon was treated differently than a member of the general public would be treated in similar circumstances.

120.    Suffolk County Department of Health Services, Dr. Geraci, and Dr. Chaudhry, lacked any adequate jurisdiction for treating Dr. Dillon different than they would treat a member of the general public under the circumstances.

121.    As a direct and proximate result of the adverse employment actions taken against her, Dr. Dillon has suffered a chilling effect on the exercise of her First Amendment right to free speech, damage to her professional reputation, economic loss and emotional distress.

122.    By suspending Dr. Dillon without pay, and taking the other adverse employment actions taken against her, Suffolk County Department of Health Services, Dr. Geraci and Dr. Chaudhry have chilled the exercise of free speech by persons with knowledge of deliberately indifferent medical treatment of prisoners, the possible abuse of prisoners, and the forgery, destruction and alteration of medical records in the Riverhead Correctional Facility.

## SECOND CAUSE OF ACTION
### Violation of the New York State Whistle Blower Statute, New York Civil Service Law § 75-B

123.    The Suffolk County Department of Health Services is a public employer as that term is used in New York Civil Service Law § 75-B, ¶2(a).

124.    Plaintiff Patricia Dillon is a public employee at that term is used in New York Civil Service Law § 75-B, ¶2(a).

125.    In suspending Dr. Dillon without pay, and taking the other adverse employment actions against her as set forth herein, the Suffolk County Department of Health Services took an adverse personnel action against Dr. Dillon.

126.     Dr. Dillon's suspension and the other adverse employment actions taken against her as set forth herein were substantially motivated by her reporting to the Department of Health Services and others, information regarding a violation of a law, rule or regulation, specifically a violation of the Eighth Amendment to the United States Constitution, as well as other applicable rules and regulations concerning the medical treatment of prisoners.

127.     The conduct that Dr. Dillon reported creates and presents a substantial and specific danger to public health and safety.

128.     The statements made by Dr. Dillon to officers within the Suffolk County Department of Health Services and others regarding the negligent and/or deliberately indifferent medical treatment of prisoners in the Riverhead Correctional Facility and possible abuse of prisoners, as well as the forgery and adulteration of medical records, were reasonably believed to be true by Dr. Dillon and Dr. Dillon reasonably believed that such conduct constitutes an improper governmental action.

WHEREFORE, plaintiff demands judgment against all defendants in her first and second causes of action enjoining the suspension of Dr. Patricia Dillon, M.D. by Suffolk County Department of Health Services; ordering the reinstatement of Dr. Dillon to her previous position as Director of the Communicable Disease and Epidemiology Division of the Suffolk County Department of Public Health, with all compensation and prerequisites incumbent thereon, or a commensurate position within the Suffolk County Department of Public Health other than in the Jail Medical Unit; awarding Dr. Dillon back pay, front pay, emotional distress damages and attorneys' fees, as well as punitive

damages against defendants Chaudhry and Geraci, individually, together with such other

and further relief as is deemed just and proper.

## **JURY DEMAND**

129.  Plaintiff herein demands a trial by jury of all issues in this action.


Dated:  October 27, 2010
            Garden City, New York

DAVID S. FEATHER (DF-1832)
THE LAW OFFICES OF
DAVID S. FEATHER
666 OLD COUNTRY ROAD
SUITE 304
GARDEN CITY, NY 11530
(516) 745-9000

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

PATRICIA DILLON, M.D., M.P.H.,                          07-CV-4722

                              Plaintiff,

           -against-                                    VERIFICATION

SUFFOLK COUNTY DEPARTMENT OF
HEALTH SERVICES, HIMAYUN
CHAUDHRY, individually and as
Commissioner of the Suffolk County
Department of Health Services, and
VINCENT GERACI, individually and as
Medical Program Administrator of the Jail
Medical Unit of the Suffolk County
Department of Health Services,

                              Defendants.
---------------------------------------------------------x

STATE OF _MD_____, COUNTY OF _Montgomery_

     I, Patricia Dillon, am the plaintiff in the above-captioned action, and hereby state
under penalty of perjury that I have read the foregoing Amended Complaint and know the
contents thereof; the same is true to my own knowledge, except as to the matters therein
stated to be alleged on information and belief, and as to those matters I believe to be true.

Dated: Garden City, New York
       October 27, 2010

                                              _____
                                              Patricia Dillon, M.D.

Sworn to before me this 27
day of October, 2010

SAMUEL S. BETAH
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES MAY 16, 2014

County/City of _Montgomery_
State of Maryland
The foregoing instrument was subscribed and sworn before
me this 27 day of October, 2010
by Patricia Dillon Conley
                                              _____ Notary Public
My commission expires _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

PATRICIA DILLON, M.D., M.P.H.,                                    CV 07-4722 (TCP) (WDW)

                           Plaintiff,

          -against-                                       **AFFIDAVIT OF
                                                          SERVICE**

SUFFOLK COUNTY DEPARTMENT OF
HEALTH SERVICES, HUMAYUN
CHAUDHRY, individually and as
Commissioner of the Suffolk County
Department of Health Services, and
VINCENT GERACI, individually and as
Medical Programs Administrator of the Jail
Medical Unit of the Suffolk County
Department of Health Services,

                          Defendants.
------------------------------------------------------------X

STATE OF NEW YORK    )
                              ) ss.:
COUNTY OF NASSAU    )

      Donna Gengler, being duly sworn, deposes and says:

      I am not a party to the foregoing action, am over the age of 18 years, and I reside in Port Washington, New York.  On October 28, 2010, I served the within document:

                        **AMENDED VERIFIED COMPLAINT**

by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the following person or persons at the addresses set forth:

Chris P. Termini, Esq.
Office of the Suffolk County Attorney
Attorney for the Defendants
P.O. Box 6100
100 Veterans Memorial Highway
Hauppauge, New York 11788

                                                *Donna Gengler*
                                            DONNA GENGLER

Sworn to me this 28th day
of October, 2010

_____
NOTARY PUBLIC

                        DAVID S. FEATHER
                        NOTARY PUBLIC, State of New York
                        No. 02FE5049162
                        Qualified in Nassau County
                        Commission Expires Sept. 11, 20__

Index No.: CV 07-4722 (TCP) (WDW)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

PATRICIA DILLON, M.D., M.P.H,

                              Plaintiff,

        -against-

SUFFOLK COUNTY DEPARTMENT OF
HEALTH SERVICES, HUMAYUN
CHAURHRY, individually and as
Commissioner of the Suffolk County
Department of Health Services, and
VINCENT GERACI, individually and as
Medical Programs Administrator of the Jail
Medical Unit of the Suffolk County
Department of Health Services,

                              Defendants.

---

## AMENDED VERIFIED COMPLAINT

---

Law Offices of David S. Feather
Attorneys for Plaintiff
666 Old Country Road, Suite 304
Garden City, New York  11530
(516) 745-9000
fax (516) 228-8349

---

*Dated: October 28, 2010*          Signature _____
                                        David S. Feather, Esq.

---