FILED
CLERK

1/16/2013 2:17 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
PATRICIA DILLON,

                     Plaintiff,

            -against-

SUFFOLK COUNTY DEPARTMENT OF
HEALTH SERVICES, HUMAYUN
CHAUDHRY, individually and as
Commissioner of the Suffolk County
Department of Health Services, and VINCENT
GERACI, individually and as Medical Programs
Administrator of the Jail Medical Unit of the
Suffolk County Department of Health Services,

                   Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
07-cv-4722 (ADS)(WDW)

<u>**APPEARANCES:**</u>

**The Law Offices of David S. Feather**
*Attorneys for the Plaintiff*
666 Old Country Road
Suite 605
Garden City, NY 11530
      By: David S. Feather, Esq., Of Counsel

**Office of the Suffolk County Attorney**
*Attorneys for the Defendants*
H. Lee Dennison Building
P.O. Box 6100
100 Veterans Memorial Highway
Hauppauge, NY 11788-0099
      By:  Chris P. Termini, Assistant County Attorney

**SPATT, District Judge**.

      This action was commenced by the Plaintiff Patricia Dillon, M.D., M.P.H. ("Dr. Dillon"

or "the Plaintiff") seeking compensatory damages, punitive damages, equitable relief, and

attorneys' fees based on the Defendants (1) taking adverse employment actions against her,

including but not limited to suspending her from employment without pay and bringing charges

1

against her pursuant to New York State Civil Service Section 75, all in retaliation for her exercise of free speech, speaking as a citizen regarding a matter of public concern in complaining of consciously indifferent medical treatment of prisoners and possible prisoner abuse in the Riverhead Correctional Facility in Suffolk County, New York; and (2) taking adverse employment actions against Dr. Dillon in violation of New York Civil Service Law § 75-B, by retaliating against her for reporting illegal conduct and/or conduct that she reasonably believed constituted improper government action.  Thus, Dr. Dillon asserts (1) a First Amendment retaliation claim and (2) a claim pursuant to the New York State whistleblower statute against the Defendants Suffolk County, Dr. Humayun Chaudhry, and Dr. Vincent Geraci.

Presently before the Court is the Defendants' motion for summary judgment.  For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

The Plaintiff Patricia Dillon is a medical doctor who worked as a high-ranking public health employee of Suffolk County from 2001 through August 2007.  On August 22, 2007, Dillon was transferred from her administrative public health position to Suffolk County's Riverhead Correctional Facility, where she was assigned to provide primary health care to individual prisoners.  Dr. Dillon alleges that she was transferred by the newly appointed Suffolk County Commissioner of Health Services, Defendant Humayun Chaudhry, D.O. ("Dr. Chaudry").  In her new position, she reported to Defendant Vincent Geraci, M.D. ("Dr. Geraci"), the Medical Programs Administrator of the Jail Medical Unit ("JMU") of the Suffolk County Department of Health Services.  Dr. Dillon does not state why she was transferred to the Suffolk County Jail, and this transfer does not form the basis of any of her claims.  According to the Plaintiff, she never received an oral or written description of her new assignment.

2

On September 4, 2007, Dr. Dillon met with Dr. Geraci to discuss her new assignment in the JMU.  At that time, he explained to Dr. Dillon the nature and procedures of the JMU.  The Plaintiff claims that during the course of this discussion, Dr. Geraci told her that JMU (1) routinely denied methadone to patients in methadone maintenance programs; (2) does not provide asthma inhalers to patients; and (3) delays starting patients on medications for several days after they arrive.

On the following day, September 5, 2007, Dr. Geraci requested that the Plaintiff assist him with chart reviews.  While observing these charts, Dr. Dillon noted that several patients were receiving inadequate treatment.  For example, one chart showed that a patient had received no treatment for broken ribs; not even pain medication.  She raised her concerns with Dr. Geraci.  In addition, on that same day, Dr. Dillon expressed her concern to Rick Kaufman, a social worker at JMU who serves as Dr. Geraci's second-in-command.

For the next day and a half, the Plaintiff was assigned to the file room and directed to help file charts and conduct chart reviews.  In the course of doing so, she once again observed further evidence of inadequate medical treatment and possible prisoner abuse.  Dr. Dillon then made photocopies of the relevant portions of these charts.  Again, Dr. Dillon reported her concerns to Dr. Geraci, but her concerns were dismissed.  In particular, he denied Dr. Dillon's suggestion that federal and/or state authorities be contacted to perform an outside audit of the JMU.  On September 6, 2007, Dr. Dillon also called Paul Sabatino, the Chief Deputy County Executive, to discuss some of her concerns regarding the order and dispensation of pharmaceuticals at the JMU.

On September 7, 2007, Dr. Geraci told Dr. Dillon that because she was a female, she would need to start seeing OB/GYN patients.  At that time, the Plaintiff explained that she did

3

not have the necessary experience or training in gynecology and was also not properly credentialed to treat patients in this area.  Nevertheless, Dr. Geraci told her that he would have one of the nurse practitioners train her in gynecology and would take care of filing the appropriate paperwork in order for her to receive the proper credentials.

On that same day or the following Monday, September 10, 2007, Dr. Dillon also expressed her concerns to John Heilbrunn, a contracts administrator with Suffolk County Health Services.  She explained to him that she had been working at JMU for approximately one week and that she had learned that necessary medications were not being prescribed; that  prescribed medications were not being administered to patients; that there was an unwritten policy requiring nurses to list unadministered medications as having been administered by a fictitious nurse; that abnormal test results were removed from charts; that injured and acutely ill patients were being neglected and left untreated; that required diagnostic tests were not being performed; and that mistreatment of patients was being covered up.

On September 10, 2007, the Plaintiff reached out to the Defendant, Dr. Chaudhry, and informed him of her various concerns.  She told Dr. Chaudhry that Dr. Geraci had instructed her that inmates are entitled to a less standard of medical care than the general population.  The Plaintiff also notified Dr. Chaudhry that when patients at the JMU were not administered medication, the staff was instructed to note that the medication had been administered by a fictitious nurse.

On that same day, Dr. Geraci received a questionnaire from the Suffolk County Director of Compliance, which listed various areas of competency that would be required for the Plaintiff to be credentialed to practice gynecology.  Dr. Geraci instructed Dr. Dillon to sign the papers and attest that she was competent in these various areas, but she refused, stating that she did not

know how to perform the listed procedures.  In response, Dr. Geraci insisted that Dr. Dillon pursue whatever steps were necessary to receive the credential or submit a written refusal to see patients.  Dr. Dillon then reiterated her concerns about the level of care at the JMU, and informed Dr. Geraci that she had contacted her union and they had advised her not to sign anything.  Dr. Geraci then demanded that Dr. Dillon leave the JMU and she was escorted off the premises.

It appears that from September 4, through September 11, 2007, Dr. Dillon photocopied "problematic" charts and brought them to Dr. Geraci's attention.

On September 11, 2007, Dr. Dillon reported to work as she had on previous days, but was told by a file clerk that she needed to speak with Dr. Geraci before filing any charts.  She was then called into Dr. Geraci's office, where Rick Kaufman was present.  At this meeting, Dr. Dillon was told that she was being moved from the file room to an exam room, and she was handed a new protocol that forbade her from photocopying patient charts.  After this meeting, she stopped photocopying any documents.

Later that day, Dr. Chaudhry responded to an earlier email from the Plaintiff regarding her concerns about the medical treatment in the JMU, and wrote to her that "as a reminder, Dr. Geraci is your immediate supervisor and it is correct to work with him in the chain of command to clarify any questions or confusion you may have about Jail Medical Unit (JMU) operations or your role in them."

On September 13, 2007, shortly after the Plaintiff arrived at work, she was called into Dr. Geraci's office, where John Heilbrunn and three men in plainclothes with handcuffs on their person were waiting.  Dr. Geraci demanded that the Plaintiff turn over any photocopies she had made of patients charts.  Dr. Dillon failed to comply, and at that time Dr. Geraci informed her

that she was being suspended for thirty days without pay.  He then had the three men escort her off the premises with her hands held behind her back.

The Defendants have a completely different account of the events at the JMU.  For instance, the Defendants assert that the Plaintiff was directed to perform OB/GYN procedures only because she explained she was afraid to be around male inmates as a result of a prior incident in her career.  In addition, the Defendants contend that during the course of her one week in the JMU, Dr. Dillon refused to familiarize herself with the procedures employed in the JMU and refused to fill out appropriate credentialing materials which apparently were necessary as a pre-condition for her to see and treat inmates/patients.  Finally, the Defendants claim that Dr. Dillon was observed photocopying inmate medical records, and upon inquiry from Dr. Geraci, Dr. Dillon untruthfully stated she was doing so as the request of Clare Maser, a Senior Clerk Typist assigned to the JMU.  Both parties agree that Dr. Dillon refused to turn over photocopies of these documents when requested.

On September 14, 2007, the Defendants filed a complaint against Dr. Dillon with the New York State Office of Professional Misconduct, accusing her of malfeasance in the copying of records.  This ultimately resulted in an investigation that has since been closed.

On or about September 25, 2007, Dr. Dillon was served with Disciplinary Charges pursuant to New York State Civil Service Law Section 75.  The County alleged that the Plaintiff was insubordinate in refusing to obey an order to return all photocopies of prisoner medical records; in failing to obey an order to participate in a mandated training process; and in refusing a direct order to complete required credentialing paperwork.  In addition, the County alleged that she violated Suffolk County Health Department Rules and Procedures by making photocopies of confidential inmate medical records and doing so without prior consent on two separate

6

occasions.  (Def. Ex. E.)  These charges were incorporated into an Amended Statement of

Charges and Notice of Hearing, which was dated March 17, 2008.  The Plaintiff was served with

these charges on May 17, 2008.  (Def. Ex. F.)

Meanwhile, on November 13, 2007, the Plaintiff filed the instant lawsuit in the Eastern

District of New York.  According to the Plaintiff, this instigated further retaliatory conduct,

which intensified.  On November 13, 2007, the Defendant removed Dr. Dillon from the payroll

without notifying her.  She was not reinstated to the payroll until February 12, 2008.  In addition,

on November 15, 2007, Dr. Dillon received a notice that the County was going to terminate her

health insurance benefits effective November 18, 2007, unless she immediately paid the health

insurance premiums, which the Plaintiff claims she did.  Nevertheless, on December 3, 2007, the

County canceled her health insurance.  Her health insurance was not reinstated until January 15,

2009.  As another example of alleged retaliatory conduct, the Plaintiff was directed to undergo a

psychological examination on December 14, 2007.

On several occasions in January 2008, Dr. Dillon spoke to Chris McPartland, the Suffolk

County District Attorney's Government Corruption Bureau Chief, as well as a representative of

the Suffolk County Attorney's Office, regarding her concerns about both the medical treatment

of prisoners at the Riverhead Correctional Facility, as well as the forgery and adulteration of

medical records.

On January 24, 2008, the Plaintiff was reassigned to a new position in the Southampton

Clinic.  The Plaintiff raises several issues with regard to Dr. Wickramaaratachi, the Medical

Director of the facility, including that he assigned her to do OB/GYN tasks despite her lack of

experience and training in that field.  Also, he directed the Plaintiff to bill Medicaid with a

computer that had been pre-programmed to falsely attest that she was board-certified in Family

7

Practice, which the Plaintiff refused to do.  According to Dr. Dillon, during the time that she was assigned to the Southampton Clinic, from February 2008 through May 2008, she repeatedly requested that she be provided with medical textbooks to review and receive formal medical training in Primary Care medicine, but her requests were refused by the Defendant.  The Defendants dispute that this occurred.

On or about May 14, 2008, the Defendants transferred Dr. Dillon to the Riverhead Clinic. At this facility, she was directed to not go near patients or medical charts, and was assigned to a solitary room where she was only allowed to exist for a lunch period and two fifteen minute breaks.

On April 23, 2008, the Plaintiff filed an Article 78 Special Proceeding under the New York Civil Practice Law and Rules ("CPLR"), seeking a finding that the County had illegally transferred her from her prior position to the new position at the JMU, and that the County had failed to perform its lawful duties by serving the Plaintiff with Section 75 charges of misconduct pursuant to the Civil Service Law, and by violating the provisions of the Collective Bargaining Agreement.  (Def. Ex. H.)  On March 26, 2009, New York State Supreme Court Justice Paul J. Baisley issued a decision which denied the Plaintiff's petition in its entirety.  (Def. Ex. I.)  In particular, the Court found that the transfer of the Plaintiff to the JMU was proper, and that the institution of the Section 75 Charge was lawful and proper.  The Plaintiff was eventually terminated, effective February 10, 2009.

## II.  DISCUSSION

### A.  Legal Standard

It is well-settled that summary judgment under the provisions of Fed. R .Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).  Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)).  However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  Matsushita, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

## B.  As to the Plaintiff's First Amendment Retaliation Claim

The Plaintiff claims that after she spoke to various Suffolk County officials regarding her concerns over the deliberate indifference of medical treatment and the abuse of prisoners at the

Riverhead Correctional Facility; the alteration and destruction of medical records; and the possible misuse of drugs; she was retaliated against by the filing of the New York State Civil Service Discipline Charges for misconduct while she worked at the JMU from September 4, 2007 through September 13, 2007.  In addition, the Plaintiff alleges that after she filed the instant case, she was retaliated against again by the County's actions in filing additional Discipline Charges for misconduct in early 2008.  The Plaintiff also alleges a number of other retaliatory acts, including her removal from the County payroll; her health benefits being temporarily terminated; the required psychological examination; and the filing of a complaint against her with the New York State Office of Professional Misconduct.

The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008).  Where a plaintiff is a public employee and brings a claim based on allegations of retaliation for speech protected by the First Amendment, as in the present case, the three-part test articulated in Johnson v. Ganim, 342 F.3d 105 (2d Cir. 2003) provides the relevant inquiry.  See Martir v. City of New York, No. 07 Civ. 7922, 2009 WL 2191332, at *5 (S.D.N.Y. July 23, 2009).

To establish a *prima facie* case of First Amendment retaliation, a plaintiff must show that (1) she engaged in "constitutionally protected speech" because she spoke as a citizen on a matter of public concern; (2) she suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. Johnson, 342 F.3d at 112.  If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the government employer to offer some legitimate, non-retaliatory rationale for its actions. See Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995).  In other words, the burden shifts to the defendant "to show that it would

have taken exactly the same action absent the improper motive."  Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003).  If the defendant does so, then the burden then shifts back to the plaintiff to demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]."  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004).

### 1. Whether the Claimed Speech Fails the "Public" Test

The first basis for the Defendants' motion for summary judgment is that the Plaintiff did not engage in "constitutionally protected speech."  In particular, they contend that her statements related to her concerns regarding her ability to execute her duties at the JMU, and thus were undertaken in the course of performing her core employment responsibility of providing medical care to the inmates.  Furthermore, the Defendants claim that because she only acquired this information as a result of her position and what she observed on the job, her speech was made "pursuant to" her official duties as a physician.

"The [United States Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).  "[F]ew values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by the government."  Pappas v. Giuliani, 290 F.3d 143, 146 (2d Cir. 2002).  The threshold inquiry is thus whether the employee spoke as a citizen on a matter of public concern.  "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."  Garcetti, 547 U.S. at 418.

11

As the Supreme Court has recognized, "conducting these inquiries sometimes has proved difficult." Id. Indeed, the present question the Court now faces is not easily answered. Unlike the facts presented in Garcetti or certain Second Circuit cases where, as in Garcetti, the speech at issue was expressly part of the employee's official job duties and thus not protected under the First Amendment, here "there [is] room for serious debate" over whether Dr. Dillon was speaking as a citizen or "pursuant to [her] employment duties." Garcetti, 547 U.S. at 424, 126 S. Ct. 1951.

### a. Legal Standard

Speech is on a matter of public concern and therefore a protected activity "if it relates 'to any matter of political, social, or other concern to the community.'" Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). In analyzing whether speech addresses a matter of public concern, courts must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cowen, 165 F.3d 154, 163–64 (2d Cir. 1999). However, "the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern." Reuland v. Hynes, 460 F.3d 409, 415 (2d Cir. 2006). Whether or not "'an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.'" Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (quoting Lewis, 165 F.3d at 163). The inquiry should be "a practical one" that goes beyond mere "[f]ormal job descriptions." Id.; see Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012) ("The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a

brightline rule.  Courts must examine the nature of the plaintiff's job responsibilities, the nature

of the speech, and the relationship between the two.  Other contextual factors, such as whether

the complaint was also conveyed to the public, may properly influence a court's decision.").

   In Garcetti v. Ceballos, supra, the recent seminal case on this issue, a supervising district

attorney was disciplined for writing a memorandum in which he recommended the dismissal of a

case on the basis of purported government misconduct.  Id.  The United States Supreme Court

found that the district attorney was *not* protected by the First Amendment because he "spoke as a

prosecutor fulfilling a responsibility to advise his superiors how best to proceed with a pending

case" and not as a private citizen.  Id. at 421.  "In Garcetti, Ceballos [the prosecutor] was acting

pursuant to his official duties because he was performing activities required to fulfill his duties."

Williams v. Dallas Indep. School Dist., 480 F.3d 689, 693 (5th Cir. 2007).  The Supreme Court

suggested that in determining whether speech is uttered pursuant to employment "[t]he proper

inquiry is a practical one" and that whether views are expressed in the office, concern the subject

matter of employment, and whether the subject speech is required by a formal job description,

are nondispositive.  Garcetti, 547 U.S at 424.  It appears that the guiding consideration, as set

forth by the Supreme Court, is whether the expressions were made pursuant to that employee's

duties.  Id. at 421 ("The controlling factor in Ceballos' case is that his expressions were made

pursuant to his duties as a calendar deputy. . .  That consideration—the fact that Ceballos spoke

as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with

a pending case—distinguishes Ceballos' case from those in which the First Amendment provides

protection against discipline.").  Under the Supreme Court's rationale, "[r]estricting speech that

owes its existence to a public employee's professional responsibilities does not infringe any

liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."  Id. at 422.

After Garcetti narrowed the scope of First Amendment protections for public employees, the Second Circuit has had several opportunities to opine on the subject.  For instance, in Weintraub v. Board of Educ. Of City School Dist. of City of New York, 593 F.3d 196, 203 (2d Cir. 2010), a terminated public elementary school teacher filed an action against the New York City Board of Education.  He asserted a First Amendment retaliation claim based upon his complaint and filing of a formal grievance to challenge the school administration's refusal to discipline a student who threw a book during class.  In that case, the Second Circuit held that the speech was unprotected because the grievance was filed pursuant to his official duties as a teacher.  In this regard, the court focused on the various guideposts set out by the Supreme Court in Garcetti.  In Weintraub, it was confirmed that the employee's official job description was not determinative as to whether the speech was made as a citizen or as an employee.  See id. at 202 ("a public employee's duties are not limited only to those tasks that are specifically designated," under the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer").  More importantly, the Second Circuit honed in on the controlling factor of whether the employee's expressions were made pursuant to one's duties.  In particular, they concluded that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel-of his concerns" about his ability to "properly execute his duties, as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.  Id. at 203.  In other words, his speech was a

14

"means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.  Id.

However, the decision also explored another main factor, which was inferred to in the Garcetti decision.  The Weintraub court looked to whether the speech took the form of an employee grievance, for which there was no relevant citizen analogue.  In particular, the court noted that:

> [t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general.  Rather than voicing his grievance through channels available to citizens generally, Weintraub made an internal communication pursuant to an existing dispute-resolution policy established by his employer, the Board of Education.

See id. 204 (asking whether the plaintiff "voic[ed] his grievance through channels available to citizens generally"); Freitag v. Ayers, 468 F.3d 528, 545 (9th Cir. 2006 )("[Plaintiff's] right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee."); Dingle v. City of New York, No. 10 Civ. 4, 2011 WL 2682110, at *6 (S.D.N.Y. July 7, 2011) (extending First Amendment protection where public official complained to "precisely" the same "administrative agencies . . . where a private citizen . . . would report").

Thus, in the wake of Weintraub, many courts inside and outside this circuit have looked to the channels through which the speech was made as pertinent to the analysis.  See, e.g., Boyce v. Andrew, 510 F.3d 1333, 1343–44 (11th Cir. 2007) (finding that the "form and context" of the employees' complaints, which were made directly to supervisors and were not "sent to an outside entity," weighed against First Amendment protection); Carter v. Inc. Village of Ocean Beach, 693 F. Supp. 2d. 203, 211 (E.D.N.Y. 2010) ("If . . . a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command

15

at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen.") (internal citations and quotation marks omitted).  But see Taylor v. N.Y. City Dep't of Ed., No. 11 Civ. 7833, 2012 WL 3890599, at *5 (S.D.N.Y. Sept. 6, 2012) ("Garcetti and Weintraub suggest that if the content of an employee's speech is directed toward the proper performance of their own specific job duties, it was likely as an employee even if made through external channels.").

In addition to the factors explored above, the Court notes that an employee may be performing her job when she speaks, even if the expression is not necessarily demanded of her. See Sweeney v. Leone, No. 05 Civ. 871, 2006 WL 2246372, at *8 (D .Conn. Jul. 31, 2006) (holding that police dispatcher's calls "to request help in the overloaded dispatch center . . . were made pursuant to his official duties as dispatch supervisor of the shift").  Speech need not be "required by, or included in, the employee's job description, or in response to a request by the employer," so long as it is "a means to fulfill, and undertaken in the course of performing," one of the employee's "primary employment responsibilit[ies]."  Weintraub v. Bd. of Educ., 593 F.3d 196, 203 (2d Cir. 2010) (internal quotation marks and citations omitted); see Flyr v. City Univ. of New York, No. 09 Civ. 9159, 2011 U.S. Dist. LEXIS 44047, 2011 WL 1675997, at *3 (S.D.N.Y. Apr. 25, 2011).  As a rule of thumb, activities required of the employee as part of his employment duties are not performed "as a citizen" if they are not "the kind of activity engaged in by citizens who do not work for the government."  Jackler v. Byrne, 658 F.3d 225, 238 (2d Cir. 2011) (internal quotation marks and citations omitted).

Precedent thus dictates several important considerations that this Court must keep in mind when determining whether Dr. Dillon's complaints were made on a matter of public concern as a private citizen.

16

### b. Matter of Public Concern

As an initial matter, there is no doubt that Dr. Dillon's speech was a matter of public concern, and the Defendants do not attempt to argue otherwise.  Dr. Dillon made serious allegations regarding the policies and practices at JMU, including that necessary medications were not being prescribed; prescribed medications were not being administered to patients; that there was an unwritten policy requiring nurses to list unadministered medications as having been administrated by a fictitious nurse; that abnormal test results were removed from charts; that injured and acutely ill patients were being neglected and left untreated; that required diagnostic tests were not being performed; and that mistreatment of patients was being covered up.  "These incidents, the inadequacy of training and care within the facility, and the lack of a response to reported conditions implicate the health, welfare and safety of severely disabled individuals in the care of the state, are matters of importance to the public."  McLaughlin v. Pezzolla, No. 06 Civ. 0376, 2010 WL 56051, at *9 (N.D.N.Y. Jan. 4, 2010).  See Dimarci v. Rome Hosp., No. 88 Civ. 1258, 1991 WL 336000, at *1 (N.D.N.Y. July 1, 1991) (finding complaints in which the plaintiff "raised questions about . . . the professional conduct and medical judgment of several of his colleagues and the nursing staff, the Hospital's overall patterns and practices, and the leadership and competence of those individuals who were responsible for managing the Hospital" to be matters of public concern); Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 164 (2d Cir. 2006); Coward v. Gilroy, No. 05 Civ. 285, 2007 WL 1220578, at *6 (N.D.N.Y. Apr. 24, 2007) (finding that complaints about systemic concerns which were "wide-reaching and dealt with his patients' well being, the general workings of the hospital, and the community's interest in quality care" would have brought speech into the realm of public concern, but that specific speech was not a matter of public concern because "statements made

were specific and personal in nature" and related only to the treatment on one patient).  Cf. Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991) (holding that a medical resident's complaints regarding her treatment in a residency program did not address matters of public concern); Kirby v. Yonkers School Dist., 767 F. Supp. 2d 452, 462 (S.D.N.Y. 2011).

### c.  Speaking as a Citizen or as an Employee

Next, the Court proceeds to the more difficult inquiry—whether Dr. Dillon's speech was made as an employee of the County in the JMU or as a private citizen.  "In applying Garcetti and Weintraub to this second and more nebulous class of cases where no clear 'official duty' to speak is present on the record, this Circuit focuses on the subject, manner, and context of the speech to determine whether it relates to topics that are 'indispensable prerequisites to effective' performance of the speaker's 'primary employment responsibility,' and thus not entitled to First Amendment protection."  Griffin v. City of N.Y., No. 10 Civ. 2592, 2012 WL 3090295, at *9 (E.D.N.Y. July 31, 2012) (comparing Tucker v. City of New York, No. 07 Civ. 10367, 2011 WL 2893077, at *6 (S.D.N.Y. July 15, 2011) (holding city employee's complaints about a colleague's corruption were protected because they did not have "any bearing on [the employee's] ability to carry out his job as a [Poison Control Information Specialist]."); with Carter v. Inc. Vill. of Ocean Beach, 693 F. Supp. 2d. 203, 211 (E.D.N.Y. 2010), aff'd, 415 Fed. App'x. 290 (2d Cir. 2011) (finding no First Amendment protection where "[a]ll of plaintiffs' complaints to their superiors . . . related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern . . . [that various acts] affected their ability to perform their job assignments safely . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 353 (S.D.N.Y. 2010) (holding speech "part-and-parcel" of police officer's duties and not

protected where "common theme of all [of plaintiff's] statements was that [his partner] was violating suspects' rights and was not performing his job properly, and by implication that [the partner] was interfering with [plaintiff]'s ability to perform his own duties.")).

First, the Court agrees with the Defendants that the Plaintiff's speech undeniably concerned the subject matter of her employment, namely the treatment of patients at the JMU. Nevertheless, the Supreme Court has made clear that this alone is not dispositive. See Garcetti, 547 U.S. at 421 ("The First Amendment protects some expressions related to the speaker's job.").

As for whether her expressions were made pursuant to her duties, the Plaintiff appears to have never received a formal job description when she began her employment. She was at the JMU for a brief period of time—approximately one week—and during that period she largely spent her time filing patient charts and shadowing nurse practitioners. Regardless, it cannot be disputed that the Plaintiff was hired to perform medical duties for the inmate population. This is clear based upon her extensive career background and the various conversations she had with her supervisors regarding their desire for her to perform OB/GYN examinations and procedures. In addition, the description for a "Physician III" civil service position, which the Defendant argues the Plaintiff necessarily reviewed prior to applying for employment with the County, describes her duties as "[p]erform[ing] professional medical services for departments and agencies of Suffolk County." (Def Ex. D.)

Strictly speaking, she was not employed to uncover gaps or errors on inmates' medical charts, nor was she hired to oversee that the inmates were receiving proper medical care. Nevertheless, the relevant inquiry is not that narrow. To count as employee rather than citizen speech, it must be made "in furtherance of one of" the employee's "core duties." Garcetti, at

19

198.  This category extends beyond specific speech made at the behest of the employer; it encompasses speech that is "part-and-parcel" of an employee's ability to properly execute his or her duties.  See id. at 203.

However, even in light of the broader perspective that the Plaintiff's job duties included the general medical treatment of inmates in the JMU, the Court finds that Dr. Dillon's speech was not made pursuant to those duties.  See DiMarco v. Rome Hosp. and Murphy Hosp., No. 88 Civ. 1258, 1991 WL 336000, *8 (N.D.N.Y July 1, 1991) (finding that speech was protected where it was wide-reaching and dealt with his patients' wellbeing, the general workings of the hospital, and the community's interest in quality care); see also Paradis v. Montrose Mem. Hosp., 157 F.3d 815, 818 (10th Cir. 1998) (holding that a nurse's complaints that a doctor only treated patients based on their ability to pay and practicing without a license constituted public speech); Springer v. Henry, No. 00 Civ. 885, 2004 WL 2127172, at *11 (D. Del. Sept. 16, 2004) (determining that a public health care provider's speech regarding a psychiatric center's dangerous conditions and practices that could lead to suicides and escapes constituted protected public speech addressing an issue of concern for the community).

In the instant case, unlike the complaint in Weintraub which referred to incidents in the teacher's own classroom, the Plaintiff's complaints referred to systemic mistreatment and corruption extending outside of her own personal duties and affecting inmates with whom she had no personal or job connection.  See McLaughlin v. Pezzolla, No. 06 Civ. 0376, 2010 WL 826952 (N.D.N.Y. March 04, 2010).  The Court finds that, as a matter of law, this speech was not made pursuant to her official duties but rather that of a concerned citizen seeking to bring certain wrongdoing to light.  Cf. Barclay v. Michalsky, 368 Fed App'x 266 (2d Cir. 2010) (finding that complaints to supervisors that her co-workers were mistreating patients was within

her duties, but largely because she testified that she "did [her] duty . . .[she] did [her] job" and conceded that she personally received instructions from her supervisors to report verbally to them any violations).

One could argue that if there was a systematic practice of inadequate treatment and widespread usage of fictitious treatments and omissions in the patients' charts, this would inevitably affect the Plaintiff's ability to perform her job of providing adequate medical treatment to the prisoners.  However, the Court finds that this relationship is too attenuated and would stretch the logic of <u>Garcetti</u> to an unreasonable degree.  "Were "part-and-parcel" to encompass all speech that aims to improve a government employee's workplace—thereby helping the employee carry out her core duties there—everything that employees say relating to their work would end up falling outside the First Amendment's protections.  This would fly in the face of the Supreme Court's repeated reminders that government employees' speech is often most valuable when it concerns a subject they know best: their jobs."  <u>Ricciuti v. Gyzenis</u>, 832 F. Supp. 2d 147, 157 (D. Conn. 2011).

While the Defendants do not raise this point, it would also be reasonable to assert that as a physician, Dr. Dillon had a duty to report any misconduct she saw with regard to the treatment of patients.  In fact, "[d]octors . . . have an affirmative duty to report misconduct of a licensed professional under New York law."  N.Y. Public Health Law § 230–11 (McKinney 2008).  Yet, the Court is not persuaded that this forecloses the Plaintiff's claim to First Amendment protection.  This would be akin to preventing any public doctor from having a First Amendment retaliation claim anytime the speech was remotely related to the treatment of patients.  The Supreme Court's narrow "hold[ing] that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes,"

21

Garcetti, 126 S. Ct. at 1960, "should not be read to overrule all First Amendment whistleblower protection cases by generally categorizing whistleblowing as part of employees' employment obligations." Walters v. County of Maricopa, Ariz., No. 04 Civ. 1920, 2006 WL 2456173, at *14 (D. Ariz. Aug. 22, 2006).

One's professional reporting obligations, imposed by an outside authority and mandated by some edict like the New York Public Health Law, is not necessarily part of one's duties *as an employee*. This is in stark contrast to other cases where speech was found to be unprotected because the plaintiffs reported wrongdoing pursuant to broadly applicable work rules and/or employee manuals requiring reporting of internal corruption or misconduct. See, e.g., Barclay v. Michalsky, 368 Fed. App'x. 266 (2d Cir. 2010) and Paola v. Spada, 372 Fed. App'x. 143 (2d Cir. 2010). Here, the Defendants have not pointed to any particular policy or manual that would require the internal reporting of corruption or misconduct so as to make the Plaintiff's complaints part-and-parcel of her duties as an employee. Even if such a manual or policy was in existence, this would not be dispositive. See Griffin, 2012 WL 3090295, at *10 ("Thus the fact that plaintiff's reporting may have been required by some broader written policy applicable to all police officers has no bearing on whether such reporting was actually expected or permitted, much less tolerated, in practice.").

In addition, Dr. Dillon's complaints went far beyond the scope of just inadequate medical treatment by other physicians. The Plaintiff also expressed her concerns regarding the potential cover up of abuse by prison guards. This could not be said to be "in furtherance of one of" the employee's "core duties." Weintraub, 593 F.3d at 198. Cf. Matthews v. Lynch, No. 11–1734–cv, 2012 WL 1873657, at *1–2 (2d Cir. May 24, 2012) (finding report of police corruption by

member of Connecticut State Police Internal Affairs' not protected by First Amendment because plaintiff was specifically tasked with investigating the misconduct of fellow officers ).

Furthermore, some instances of the Plaintiff's speech had citizen analogues, a factor which weighs in favor of finding that her expressions were made as a private citizen. See Kiehle v. County of Cortland, No. 09 Civ. 1259, 2011 U.S. Dist. LEXIS 73711, *13–14, 2011 WL 2680713 (N.D.N.Y July 8, 2011) ("Although not a dispositive factor, the existence of a citizen analogue may serve as a proxy for the controlling question of what role the speaker occupied when [she] spoke." (internal citation and quotation marks omitted)).  Here, many of Dr. Dillon's complaints were to her supervisors, the Defendants Dr. Chaudhry and Dr. Geraci, and thus were within the chain of command.  Dr. Dillon also expressed concern to Rick Kaufman, a social worker at JMU who served as Dr. Geraci's second-in-command.  However, Dr. Dillon also called Paul Sabatino, the Chief Deputy County Executive, to discuss some of her concerns regarding the order and dispensation of pharmaceuticals at the JMU.  In addition, the Plaintiff expressed her concerns to John Heilbrunn, a contact administrator with Suffolk County Health Services.  Further, on several occasions, Dr. Dillon spoke to Chris McPartland, the Suffolk County District Attorney's Government Corruption Bureau Chief, as well as a representative of the Suffolk County Attorney's Office, regarding her concerns about both the medical treatment of prisoners at the Riverhead Correctional Facility, as well as the forgery and adulteration of medical records.  These latter communications were not part of an established internal communication method.  In fact, Dr. Chaudhry wrote to the Plaintiff that "as a reminder, Dr. Geraci is your immediate supervisor and it is correct to work with him in the chain of command to clarify any questions or confusion you may have about Jail Medical Unit (JMU) operations or

your role in them."  This further reinforces the fact that communications beyond Dr. Geraci and

Dr. Chaudhry were done outside the relevant chain of command.

      Moreover, speaking to a contact administrator with Suffolk County Health Services or

with the Suffolk County District Attorney's Government Corruption Bureau Chief are actions

that could have been undertaken by any member of the public at large.  Thus, Dr. Dillon lodged

her grievances through channels of discourse that are available to non-employee citizens.  See

Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006) (focusing on a former prison guard's

"responsibility as a citizen to expose . . . official malfeasance" in holding that the First

Amendment protected her complaints to a state senator and the Inspector General's office about

her superior's failure to respond to inmates' sexually explicit behavior towards female guards

because the "right to complain both to an elected public official and to an independent state

agency is guaranteed to any citizen in a democratic society regardless of his status as a public

employee.").  The fact that the Plaintiff first spoke within her chain of command "is of no

consequence."  Griffin, 2012 WL 3090295, at *12; see Carter, 693 F. Supp. 2d. at 211 ("If . . . a

public employee takes his job concerns to persons outside the work place *in addition to raising*

*them up the chain of command at his workplace*, then those external communications are

ordinarily not made as an employee, but as a citizen.") (emphasis added) (internal citations and

quotation marks omitted).

      The Defendants assert that Dr. Dillon's speech cannot be protected by the First

Amendment because all of her complaints were made based upon her personal knowledge that

she acquired solely while working at the jail.  However, this contention is without merit.  As

explained in Griffin v. City of N.Y., 2012 WL 3090295, at *12 (E.D.N.Y. July 13, 2012), where

the defendants made a similar argument that there were no allegations that a member of the

general public would have knowledge of the alleged misconduct, the court explained that was "exactly the point", because "[s]uch speech must necessarily be protected by the First Amendment to protect the public's significant First Amendment interest in receiving information about the functioning of government, to which they otherwise would not be privy." As further explained by the Griffin court, "[w]ere [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." Id. (citing City of San Diego v. Roe, 543 U.S. 77, 82, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004) (per curiam)); see also Garcetti, 547 U.S. at 419, 126 S. Ct. 1951 (acknowledging that "First Amendment interests . . . extend beyond the individual speaker" and recognizing "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion"); Pickering, 391 U.S. at 572, 88 S. Ct. 1731 ("Teachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.").

Therefore, the Court finds as a matter of law that the speech at issue here is on matters of public concern and was spoken as a citizen, and therefore a protected activity. Accordingly, the Defendants' motion for summary judgment on this ground is denied.

### 2. **Causal Connection**

In the Defendants' motion for summary judgment, they also argue in the alternative that the Plaintiff has failed to establish the requisite causal connection. In particular, they assert that even if Dr. Dillon's speech is protected under the First Amendment, in order for her to prevail on

her retaliation claim, she must establish a causal connection between her protected activity and the Defendants' alleged adverse employment actions.  This causal connection must be sufficient to support a finding that the Defendants' speech was a substantial or motivating factor in the adverse action.

The Defendants contend that as established through the findings of Hearing Officer Herzweig, the Plaintiff engaged in numerous acts of misconduct while she was employed at the JMU, such as refusing to obey orders with respect to returning inmate records; refusing to participate in mandated training; and refusing to complete required credentialing.  Therefore, the Defendants assert that the County had the power to act, namely to rectify employee misuse of her job responsibilities, regardless of her speech.  In other words, the record arguably shows an independent basis for the actions of the Defendants.

"As for the third element, causal connection, 'allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action.'" Arteta, 141 Fed. App'x at 5 (quoting David v. Goord, 320 F.3d 346, 354 (2d Cir. 2003)).  The Plaintiff bears the "initial burden of showing that an improper motive played a substantial part in defendant's action." Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003).  The causal connection can be established either indirectly by means of circumstantial evidence—for example, by showing that the protected activity was closely followed by adverse action—or directly by evidence of retaliatory animus. Id.; Roper v. Hynes, No. 05 Civ. 7664, 2006 WL 2773032, at *8 (S.D.N.Y. Sept. 27, 2006).  However, even if the Plaintiff does so and makes out a *prima facie* retaliation claim because "there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the

26

same adverse action in the absence of the protected speech." Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998).

Here, the Plaintiff has met her burden to show a causal connection. Although she does not expressly articulate it as such, it appears that she is relying upon temporal proximity to establish such a causal connection.

"[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and citation omitted). "[T]his period is measured from the date of the 'employer's knowledge of [the] protected activity.'" Kim v. Columbia Univ., 460 Fed App'x 23, 25 (2d Cir. 2012) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Id. However, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." Flood v. UBS Global Asset Mgmt., No. 10 Civ. 374, 2012 WL 288041, at * 17 (S.D.N.Y. Feb. 1, 2012) (citation omitted). The Second Circuit, on the other hand, has previously held that "five months is not too long to find the causal relationship." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 111 (2d Cir. 2010).

Here, the Plaintiff began making her complaints about the treatment of patients in the JMU as well as the alleged fabrications and/or omissions in their medical records as early as

September 4, 2007, largely through her conversations with Dr. Geraci.  On September 13, 2007,

the Plaintiff was suspended without pay for thirty days and was escorted from the Riverhead

Correctional Facility.  On September 14, 2007, the Defendants filed a complaint against Dr.

Dillon with the New York State Office of Professional Misconduct, accusing her of malfeasance

in the copying of records.  On or about September 25, 2007, Dr. Dillon was served with

Disciplinary Charges pursuant to New York State Civil Service Law Section 75 on September

25, 2007.  Thus, the alleged retaliatory actions all took place within a few weeks of the Plaintiff's

protected activities.  "Suspect chronology—the close sequence of protest and scrutiny—

constitutes circumstantial evidence."  Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147,

153 (2d Cir. 2006).  The Court finds that this limited time period is sufficient for the Plaintiff to

meet her burden to demonstrate a causal connection and establish a *prima facie* case of

retaliation.  See Jean v. Acme Bus Corp., No. 08 Civ. 4885, 2012 WL 4171226, at *12

(E.D.N.Y. Sept. 19, 2012) ("There was a gap of approximately of five weeks to seven weeks

between his complaints and any adverse actions.  Thus, the temporal relationship is sufficient to

satisfy plaintiff's burden of showing indirect causation.  With this prong met, plaintiff has stated

a *prima facie* case of retaliation.").

### 3.  Non-Retaliatory Justification

Having determined that the Plaintiff has established her *prima facie* case, the Court turns

to the Defendants' proffer of a legitimate, non-retaliatory reason for taking action.  The

Defendants assert that they had genuine reasons and an independent basis for taking the actions

they did against the Plaintiff, so that they can show that they would have taken the same adverse

action in the absence of her protected speech.  In particular, the Defendants rely on the Findings

of Hearing Officer Herzweig, which found that the Plaintiff engaged in numerous acts of

28

misconduct while she was employed at the JMU.  According to the Defendants, this misconduct included refusing to obey supervisor orders with respect to returning inmate medical records; refusing to participate in mandated training; refusing to complete required credentialing; and refusing to review the State Commission of Correction's Minimum Standard and State Procedures pertaining to Correctional Medicine.  Consequently, Dr. Dillon was found guilty of numerous Section 75 disciplinary charges.

However, these disciplinary charges are not dispositive of this issue.  Even if the Defendants' charges against the Plaintiff were justified, which it appears they were, their pursuit of the claims against the Plaintiff may still have been motivated by an intent to punish her for exercising her First Amendment rights of speech.  There is at least a question of fact as to whether the Defendants were substantially motivated by her speech, despite the legitimate bases for the disciplinary charges.  Ultimately, a fact finder must weigh the impact of the Defendants' possible impermissible reasons on their decisions to act.

Moreover, the particular circumstances of this case further support the denial of the Defendants' motion for summary judgment with regard to causal connection, because issues of fact exist as to the Defendants' motivations.  Here, the stated legitimate reasons for subjecting the Plaintiff to adverse employment actions, such as the Plaintiff's photocopying of certain inmates' medical charts, is directly related to the protected speech—the fabrications and/or omissions in those inmates' medical charts.  Thus, this direct correlation between the protected speech and the articulated reasons for the Defendants' actions further dictate against a finding that the Defendants' actions were not substantially motivated by the Plaintiff's speech.

The Defendants also briefly raise the doctrines of *res judicata* and collateral estoppel in their motion for summary judgment, without much explanation.  It appears that the Defendants

are contending that because Dr. Dillon was found guilty of numerous acts of misconduct, she cannot relitigate whether she did or did not do those acts.

The preclusive effect of state administrative findings is governed by New York law. Kosakow v. New Rochelle Radiology Assoc., 274 F.3d 706, 728 (2d Cir. 2001).  Under New York law, a prior decision has preclusive effect as to any issue that both (1) was "necessarily decided" in the first action, and (2) is "decisive" in the later action.  See Jeffreys v. Griffin, 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 801 N.E.2d 404 (2003); Kaufman v. Eli Lilly & Co., 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985); see also Town of Deerfield v. FCC, 992 F.2d 420, 428–29 (2d Cir. 1993).  An issue that is "necessarily decided" must have been both "actually decided" and "necessary to support a valid and final judgment on the merits".  See Leather, 180 F.3d at 426; Wilder v. Thomas, 854 F.2d 605, 620 (2d Cir. 1988).

New York law provides a whistle-blowing defense at a Section 75 hearing.  Thus, Dr. Dillon, if she reasonably believed that the disciplinary action "would not have been taken but for [protected whistle-blowing activity]," could assert that claim as a defense; if the hearing officer found "that the dismissal or other disciplinary action [was] based solely on a violation by the employer [of the whistle-blower protections]," the hearing officer was to dismiss or recommend dismissal of the disciplinary charges.  N.Y. Civil Service Law § 75–b(3)(a).

However, at her hearing it does not appear that the Plaintiff raised the defense that the charges were illegitimate retaliation for her protected speech, and the hearing officer did not consider such a defense *sua sponte*.  "Moreover, under state law, the only finding necessary to support a valid judgment in the administrative hearing was that the [Defendants] w[ere] not solely motivated by retaliatory animus against [the Plaintiff] for initiating disciplinary action against [her]."  Broich v. Inc. Village of Southampton, 462 Fed App'x 39, 46 (2d Cir. 2012)

(citing N.Y. Civil Service Law § 75–b(3)).  However, to make out a First Amendment retaliation claim, Dr. Dillon need only establish that the protected activity was a substantial or motivating factor for the adverse employment action.  Even granting collateral estoppel effect to the hearing officer's findings that were necessary to support his ultimate determination, this would not preclude the Plaintiff from establishing the required elements of her First Amendment retaliation claim.  As stated by the Second Circuit, "[t]hat the [Defendants] had sufficient justification to bring charges against [Dr. Dillon] does not resolve the question of whether they would in fact have brought the charges in the absence of retaliatory animus."  Id. at 46 n.4 (citing DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 & n.8 (2d Cir. 1987) ("In the event, however, that appellees were motivated by retaliatory animus in instituting the Section 75 proceeding, Title VII would be violated even though there were objectively valid grounds for the proceeding and the resulting discharge.").

Here, it is possible that the disciplinary charges—even though upheld in administrative proceedings—would not have been brought but for the Defendants' retaliatory motive.  Indeed, there is nothing in the record to support a finding that the hearing officer considered the existence of whole or partial retaliatory motive, and no ground to conclude that this issue was necessarily decided.  This is a showing that the County, as the proponent of collateral estoppel, has the burden to make,  Jeffreys v. Griffin, 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 801 N.E.2d 404 (2003), and must clearly establish, Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995).  Therefore, issue preclusion does not provide a ground for dismissal of the First Amendment retaliation claim.  Accordingly, the Defendants' motion for summary judgment as to the First Amendment retaliation cause of action is denied.

## C.  As to the Plaintiff's New York State Whistleblower Claim

Finally, with regard to the Plaintiff's other cause of action, a New York State Whistleblower claim, the Defendants assert that this claim must be dismissed on the ground that the Plaintiff has failed to serve a notice of claim within the ninety day period as required by County Law Section 52(1) and General Municipal Law Section 50(e).

A "powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—[are] available to those who seek to expose wrongdoing." Garcetti, 547 U.S. at 425; Ross, 693 F.3d 300, 2012 WL 3892396 at *6; Ruotolo v. City of New York, 514 F.3d 184, 189 n. 1 (2d Cir.2008).  The Plaintiff's second cause of action is New York's whistleblower statute, Civil Service Law § 75–b, which prohibits a public employer from, among other things, taking an adverse employment action against an employee who "discloses to a governmental body information . . . which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."  § 75–b (2)(a)(ii).

A plaintiff pursuing a claim pursuant to § 75–b must comply with the notice requirements of New York County and General Municipal Law.  See Dingle v. City of New York, 728 F. Supp. 2d 332, 348 (S.D.N.Y. 2010); N.Y. General Municipal Law §§ 50–i, 50–e; County Law § 52.  Thus, as a condition precedent to the commencement of certain types of action "against a public corporation . . . or any officer, appointee or employee thereof," a notice of claim must be served within ninety days after the claim arises.  N.Y. General Municipal Law § 50–e (1)(a). Further, New York County Law § 52 also requires notice pursuant to § 50–e for any claim for damages against a "county, its officers, agents, servants or employees."  "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with

32

the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." Dingle, 728 F. Supp. 2d at 348–49.

It appears to the Court that the Plaintiff has failed to comply with the provisions of the General Municipal Law Section 50-e.  Indeed, the Plaintiff has not argued otherwise in its opposition.  Therefore, since there is no evidence that the Plaintiff has served a notice of claim nor is there an allegation of proper service of a notice of claim in her complaint, the Plaintiff's state law cause of action for violations of the New York State Whistleblower law is dismissed.

### III.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendants' motion for summary judgment with regard to the Plaintiff's First Amendment retaliation claim is denied; and it is further

**ORDERED**, that the Defendants' motion for summary judgment with regard to the Plaintiff's state law cause of action for violations of the New York State Whistleblower law is granted; and it is further

**ORDERED**, that the parties are directed to appear before this Court for the purpose of a pre-trial conference on January 29, 2013 at 9:00am.

**SO ORDERED.**
Dated: Central Islip, New York
January 16, 2013


        ___/s/ Arthur D. Spatt_____
          ARTHUR D. SPATT
        United States District Judge